**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 17, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NATIVE AMERICAN
DISTRIBUTING, a division of Flat
Creek Cattle Co., Inc., a Missouri
corporation; JOHN DILLINER, an
individual,

      Plaintiffs-Appellants,

v.

SENECA-CAYUGA TOBACCO
COMPANY, an enterprise of the
Seneca-Cayuga Tribe of Oklahoma;
LEROY HOWARD, an individual;
FLOYD LOCKAMY, an individual;
RICHARD WOOD, and individual,

      Defendants-Appellees.

No. 07-5104

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 05-CV-427-TCK-SAJ)**

---

Jonathan C. Neff, Jonathan Neff, P.C., Tulsa, Oklahoma, for Plaintiffs-Appellants.

Daniel D. Doyle, Spencer, Fane, Britt & Browne, St. Louis, Missouri, (James W. Tilly, The Tilly Law Firm, Tulsa, Oklahoma, on the brief) for Defendant-Appellee, Seneca-Cayuga Tobacco Company.

Scott B. Wood, Wood, Puhl & Wood, P.L.L.C., Tulsa, Oklahoma, for Defendants-Appellees, Leroy Howard, Floyd Lockamy and Richard Wood.

Before **BRISCOE** and **GORSUCH,** Circuit Judges, and **PARKER,** District Judge.[*]

**BRISCOE**, Circuit Judge.

Plaintiffs Native American Distributing and John Dilliner filed suit in federal court against the Seneca-Cayuga Tobacco Company ("SCTC"), which is an enterprise of the Seneca-Cayuga Indian Tribe, and three individuals who had been officers of SCTC (the "Individual Defendants"). SCTC and the Individual Defendants moved to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., arguing that the doctrine of tribal sovereign immunity shielded them from suit. The district court granted the defendants' motions and dismissed all claims with prejudice, and the plaintiffs now appeal. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm the district court's dismissal of plaintiffs' claims.

I

The Seneca-Cayuga Tribe of Oklahoma is a federally-recognized Indian tribe located primarily in and around northeastern Oklahoma. See Indian Entities Recognized & Eligible To Receive Services From the United States Bureau of Indian Affairs, 67 Fed. Reg. 46328, 46331 (July 12, 2002). Section 3 of the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. § 503, grants the membership

---

[*] The Honorable James A. Parker, United States District Judge for the District of New Mexico, sitting by designation.

of the Seneca-Cayuga Tribe the right to organize and act through two entities: a governmental entity organized under a constitution and a corporate entity organized under a corporate charter. Though not bound to do so, the membership of the Seneca-Cayuga Tribe has exercised its powers under Section 3 and has enacted both a constitution and a corporate charter.

The tribal constitution and bylaws were ratified on May 15, 1937, creating an organized government for the membership of the Seneca-Cayuga Tribe. Among other things, the tribal constitution created a "Business Committee" with the "power to transact business or otherwise speak or act on behalf of the Seneca-Cayuga Tribe in all matters on which the Tribe is empowered to act." Tribal Const. art. VI, ROA at 49. Shortly thereafter, on June 26, 1937, the Seneca-Cayuga Tribe adopted its corporate charter. Under the charter, the "membership, the officers, and the management of the incorporated Tribe"—including the Business Committee—are identical to those set forth in the tribal constitution. Corp. Charter § 2, ROA at 84. Noteworthy is section 3(b) of the Corporate Charter, which contains a clause granting the corporate entity the power "[t]o sue and be sued; to complain and defend in any court." Id. § 3(b), ROA at 84.

On July 6, 1999, the Business Committee, purporting to exercise its powers under Article VI of the tribal constitution, adopted a resolution "creat[ing] an operating division of the [Seneca-Cayuga] Tribe, a Tribal enterprise to engage in (a) the manufacture, sale, and distribution of tobacco products; and (b) any other

3

lawful commercial activity; and declar[ing] such Tribal enterprise and its activities as essential governmental functions of the Seneca-Cayuga Tribe." Resolution # 03-070699, ROA at 55, 56. The tobacco company established by this resolution became SCTC.

SCTC engaged Native American Distributing ("NAD") to serve as a distributor of its products in 2001. At the time NAD and SCTC entered into their contract, John Dilliner, a member of the Seneca-Cayuga Tribe and a shareholder and officer of NAD, reportedly asked SCTC officials whether it was necessary to secure a waiver of tribal sovereign immunity. In response, SCTC officials told him that no waiver was necessary because SCTC was subject to the "sue and be sued" clause in the Corporate Charter. NAD served as an SCTC distributor for about four years, until relations between the two companies soured.

NAD and Dilliner filed suit in United States District Court on July 27, 2005. The complaint named as defendants SCTC and Individual Defendants Leroy Howard, a former Chief of the Seneca-Cayuga Tribe; Floyd Lockamy, the General Manager of SCTC; and Richard Wood, the Plant Manager of SCTC. The complaint alleged that SCTC, under the direction of the Individual Defendants, repeatedly breached agreements between NAD and SCTC. The complaint further alleged that the Individual Defendants engaged in market manipulation and other illegal competitive practices while acting as officers of SCTC. As grounds for the court's jurisdiction over SCTC, the complaint cited the "sue and be sued" clause

4

in the Corporate Charter.

The defendants moved to dismiss, asserting that they were entitled to the Seneca-Cayuga Tribe's sovereign immunity from suit. They argued that the "sue and be sued" clause did not operate as a waiver of immunity, and that even if it did, this waiver applied only to the tribe's corporate entity (the "Tribal Corporation") and not its governmental entity (the "Tribe"). While the plaintiffs maintained that SCTC was a division of the Tribal Corporation, the defendants contended that SCTC was an enterprise of the Tribe and was thus not subject to the "sue and be sued" clause. The Individual Defendants further claimed that, as officers of SCTC acting in their representative capacities, they were also entitled to the Tribe's immunity.

Voluminous briefing of these issues ensued. During the volley of briefs, a number of exhibits were submitted to the court, including copies of the tribal constitution, Corporate Charter, and other relevant tribal documents, as well as sworn and unsworn affidavits from various parties to SCTC's dealings. The plaintiffs requested limited discovery on the jurisdictional issues, but given the evidence already before it and the scope of the requested discovery, the district court denied this request.

The district court then granted the defendants' motions and dismissed all claims with prejudice. In addressing SCTC's entitlement to tribal immunity, the court considered the "crucial question" to be "whether SCTC, in its dealings with

5

Plaintiffs, functioned as an enterprise of the Tribe or of the Tribal Corporation." Order, ROA at 385. It reasoned that "[i]f SCTC is an enterprise of the Tribe (as a governmental entity), immunity has not been waived. If SCTC is an enterprise of the Tribal Corporation, immunity has been waived by virtue of the Sue and Be Sued Clause in the Corporate Charter." Id. After examining the evidence before it, the court found that SCTC was a division of the Tribe rather than the Tribal Corporation. The court rejected the plaintiffs' argument that because SCTC officials told Dilliner that no waiver of immunity was necessary, the doctrine of equitable estoppel barred the defendants from asserting tribal immunity, and also rejected other arguments that the doctrine of tribal immunity should not be applied because of the unique context of this case. Id. at 387-94.

The court further concluded that the Individual Defendants were also protected by the Tribe's immunity. It noted that "all allegations against the Individual Defendants relate to decisions made and actions taken by them as the 'principal managers' of SCTC, an immune tribal enterprise," and as such, the Individual Defendants had a "'colorable claim of authority' from the Tribe" that extended the Tribe's immunity to them. Id. at 396. The court also rejected the plaintiffs' arguments "that the Individual Defendants acted outside the scope of authority because the Complaint alleges wrongful actions," id. at 395, and that Lockamy and Wood were "not entitled to sovereign immunity because they were merely employees of SCTC and were not 'tribal officials,'" id. at 397.

6

## II

Two issues are presented for our resolution on appeal: (1) whether the district court correctly concluded that SCTC was entitled to tribal immunity; and (2) whether the court correctly concluded that the Individual Defendants were also entitled to the protection of tribal immunity.[1]

### *SCTC's Immunity from Suit*

Indian tribes are "domestic dependent nations" with sovereignty over their members and territories. E.F.W. v. St. Stephen's Indian High Sch., 264 F.3d 1297, 1304 (10th Cir. 2001). As sovereign powers, federally-recognized Indian tribes possess immunity from suit in federal court. Berrey v. Asarco Inc., 439 F.3d 636, 643 (10th Cir. 2006); see also 25 C.F.R. § 83.2 (describing effect of federal recognition for tribes). Tribal immunity extends to subdivisions of a tribe,

---

[1] The plaintiff-appellants also purport to challenge the district court's denial of limited jurisdictional discovery. However, the argument in their opening brief contains no discussion of the discovery ruling apart from a few statements suggesting dissatisfaction with it. See Aplt. Br. at 8 ("The Trial Court erred in dismissing the case . . . without permitting any discovery as to the true nature and identity of SCTC."); id. at 16 (suggesting that the case could be remanded to the district court for further factual development). Plaintiffs have therefore waived this issue through their failure to adequately address it in their opening brief. Cf. United States v. Beckstead, 500 F.3d 1154, 1164-65 (10th Cir. 2007) (holding issue waived when discussion of it in the opening brief was limited to "two section headings, a single sentence in the brief's summary, and two phrases in arguments otherwise challenging" a separate issue); Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1031 (10th Cir. 2007) (holding issue was waived when appellant identified issue in its opening brief, but devoted less than one page of brief to it and provided "no other argument and no citations").

and even bars suits arising from a tribe's commercial activities. See Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 759 (1998) ("Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."); see also Allen v. Gold Country Casino, 454 F.3d 1044, 1047 (9th Cir. 2006) (holding that a casino that "function[ed] as an arm of the Tribe" enjoyed tribal immunity), cert. denied, 127 S. Ct. 1307 (2007); Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation, 673 F.2d 315, 320 (10th Cir. 1982) (holding that an inn which was "a sub-entity of the Tribe rather than a separate corporate entity" enjoyed tribal immunity). While the Supreme Court has expressed misgivings about recognizing tribal immunity in the commercial context, the Court has also held that the doctrine "is settled law" and that it is not the judiciary's place to restrict its application. Kiowa Tribe, 523 U.S. at 756-59. To the extent the plaintiffs have argued that we should abrogate the scope of the doctrine in the present case due to SCTC's commercial activities, we decline this request.

The Seneca-Cayuga Tribe's immunity from suit may only be overcome in one of two ways. First, Congress has the power to abrogate the tribe's immunity. Ute Distrib. Corp. v. Ute Indian Tribe, 149 F.3d 1260, 1263 (10th Cir. 1998). Second, the tribe can waive its own immunity. St. Stephen's, 264 F.3d at 1304. In either event, "a waiver of sovereign immunity cannot be implied but must be

8

unequivocally expressed." Ute Distrib., 149 F.3d at 1263 (quoting Santa Clara

Pueblo v. Martinez, 436 U.S. 49, 58 (1978)).

It is undisputed that Congress has not abrogated the immunity of either

SCTC or the Seneca-Cayuga Tribe. It is also undisputed that the Seneca-Cayuga

Tribe has unequivocally waived its own immunity via the "sue or be sued" clause

in the Corporate Charter—but only with respect to the actions of the Tribal

Corporation, and not the actions of the Tribe.[2] See id. at 1268 (holding that

waiver in a "sue and be sued" clause "is limited to actions involving the corporate

activities of the tribe and does not extend to actions of the tribe in its capacity as

a political governing body"). On appeal, the primary issue in dispute is factual:

whether SCTC is a division of the Tribal Corporation or of the Tribe. The

plaintiffs also argue that even if SCTC is a division of the Tribe, it should be

equitably estopped from asserting its immunity because its managers held it out to

be a division of the Tribal Corporation in their dealings with NAD and Dilliner.

---

[2] Whether a "sue or be sued" clause in a tribal charter actually functions as a waiver of immunity is arguable. See Felix S. Cohen's Handbook of Federal Indian Law § 7.05(1)(c) (2005 ed.) ("Most courts have reasoned that tribal adoption of a charter with such a clause simply creates the power in the corporation to waive immunity, and that adoption of the charter alone does not independently waive tribal immunity."). The defendants contested this issue before the district court. See Order, ROA at 385 n.10. On appeal, the defendants apparently concede that the "sue or be sued" clause at issue in this case constitutes an unequivocal waiver of immunity, so we need not address the typical effect of such clauses here.

Where, as here, subject-matter jurisdiction turns on a question of fact, we review the district court's factual findings for clear error and review its legal conclusions *de novo*. Southway v. Cent. Bank of Nigeria, 328 F.3d 1267, 1272 (10th Cir. 2003). Our review of the record reveals no clear error in the district court's factual finding that SCTC was a division of the Tribe rather than the Tribal Corporation. The primary evidence the district court relied upon was the Business Committee resolution that created SCTC. For several reasons, this resolution provides substantial support for the district court's finding that SCTC was a division of the Tribe.

First, the resolution specifically invokes the Business Committee's powers "to act in Behalf of the Tribe under Article VI of the Constitution and By-Laws." Resolution # 03-070699, ROA at 55. Article VI grants the Business Committee the "power to transact business" on behalf of the Tribe. Tribal Const. art. VI, ROA at 49. Under the Corporate Charter of the Tribal Corporation, the Business Committee also has broad power to act for the Seneca-Cayuga Tribe's economic benefit. See generally Corp. Charter § 3, ROA at 84-86 (outlining corporate powers). The Business Committee has previously invoked the powers of the Tribal Corporation to justify its actions. See Resolution # 31-060306, ROA at 248 (citing section 3(q) of the Corporate Charter as grounds for suspending voting rights of Tribal Councilperson). While the Business Committee could have invoked its powers under the Corporate Charter to justify the creation of a

10

tobacco company, it instead invoked its constitutional powers to do so. This lends support to the conclusion that SCTC was created by the Tribe acting in its governmental, rather than corporate, capacity.

Second, the resolution expressly declares that the tobacco company will function as "an economic development project to provide employment opportunities and revenue for the Tribe," and states that the company and its activities are "essential governmental functions of the Seneca-Cayuga Tribe." Resolution # 03-070699, ROA at 55-56. The district court interpreted this language as a declaration "that SCTC would function as an operating division of the Tribe in its governmental capacity." Order, ROA at 386. We agree with the district court's interpretation. We see no reason for the Business Committee to use this language unless it intended to make clear that the tobacco company was a division of the Tribe, and the plaintiffs have offered no alternative explanation.

Third, and finally, the resolution approved an agreement with Humble, Riggs & Associates ("H&R") for the management of the tobacco company, and provided that the "Business Committee waives the Tribal immunity from suit only to the limits set out in said management agreement and only to [H&R]." Resolution # 03-070699, ROA at 56. By including an express waiver of immunity in the resolution, one limited solely to suits brought by H&R, the Business Committee clearly expressed its belief that SCTC was a division of the Tribe that was entitled to its immunity from suit, and that in order for this immunity to be

11

waived, it would need to affirmatively express an intention to do so.

In addition to the Business Committee's resolution, the district court relied upon an affidavit by Paul Spicer, Chief of the Seneca-Cayuga Tribe and Project Developer for SCTC's creation. In his affidavit, Chief Spicer stated that SCTC "was created as an operating division of the Tribe in its governmental capacity" and that the Tribe "has never waived its sovereign immunity for the Seneca-Cayuga Tobacco Company in any of its dealings with Native American Distributing or John Dilliner." Spicer Aff., ROA 46-47, ¶¶ 3, 7. The plaintiffs attempt to undermine Spicer's credibility, pointing out contradictory statements made by Spicer in an unsworn declaration that the Tribal Corporation "has never had any operations whatsoever" and "has existed only on the paper issued to the tribe by the federal government." Spicer Unsworn Dec., ROA at 301, ¶¶ 5, 7. After review of this conflicting evidence, the district court relied upon statements in Spicer's sworn affidavit, it did not rely upon the statements in his unsworn declaration. In fact, the district court specifically assumed that Spicer's unsworn declaration was mistaken, and that "the Tribal Corporation is an existing and active entity." Order, ROA at 387 n.1.

Even if we were to assume that the plaintiffs' evidence so damaged Spicer's credibility that his affidavit was also untrustworthy,[3] the plaintiffs presented no evidence to the district court that questions the validity or effect of

---

[3] We note that the district court made no explicit credibility determinations.

12

the Business Committee's resolution. Similarly, though plaintiffs' counsel suggested at oral argument that SCTC may have been created by the Tribe yet operated by the Tribal Corporation, the plaintiffs presented no evidence supporting such a conclusion. The only evidence even remotely suggesting SCTC was created or operated as a division of the Tribal Corporation was the testimony of Plaintiff John Dilliner, who said that he believed that SCTC was subject to the terms of the Corporate Charter because he was told that it was. See Dilliner Aff. 1, ROA at 89-90; Dilliner Aff. 2, ROA at 244-46. However, Dilliner's subjective belief regarding SCTC's governing documents does not equate to an express waiver of immunity. Under these circumstances, we cannot conclude that the district court clearly erred in finding that SCTC was an enterprise of the Tribe, which has not waived its immunity.

We must also reject the contention that SCTC should be equitably estopped from asserting its immunity because its managers told Dilliner that SCTC was a division of the Tribal Corporation. We agree with the district court that the misrepresentations of the Tribe's officials or employees cannot affect its immunity from suit. We have previously recognized that "officers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court" in the absence of an express waiver of immunity. United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 931 (10th Cir. 1996) (quoting United States v. N.Y. Rayon Imp. Co., 329 U.S.

13

654, 660 (1947)) (quotations and alteration omitted). We see no reason to treat tribal immunity any differently than federal sovereign immunity in this context. See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148 (1982) (employing principles applicable to waiver of federal and state immunity to tribal immunity).

The Supreme Court has acknowledged that tribes could use their immunity as a sword rather than a shield, as is alleged here, writing that "immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." Kiowa Tribe, 523 U.S. at 758. Despite these concerns with the assertion of immunity, the Court has held fast to its position that such concerns are not the province of the courts, but of Congress or of the tribe itself. Id. at 758-60; see also Ute Distrib., 149 F.3d at 1267 (holding that there can be no "waiver of tribal immunity based on policy concerns, perceived inequities arising from the assertion of immunity, or the unique context of a case"); Pan Am. Co. v. Sycuan Band of Mission Indians, 884 F.2d 416, 419 (9th Cir. 1989) ("Indian sovereignty, like that of other sovereigns, is not a discretionary principle subject to the vagaries of the commercial bargaining process or the equities of a given situation."). This case does not present a materially different situation. Whether a tribal entity has affirmatively led or passively permitted another party to believe it is amenable to suit, in both cases the entity has concealed its immunity, to its benefit and the other's detriment.

14

The plaintiffs argue that this case is distinguishable because they are not asking us to find a waiver where none is explicit, but to extend the reach of a preexisting waiver (the "sue and be sued" clause). This is a distinction without a difference. In either situation, the defendant has not clearly and unequivocally waived its immunity from the suit at hand. The plaintiffs point to no prior case, and we have found none, that has taken into account the specific facts before it and extended a waiver of immunity to a suit that was not already within the waiver's scope. We are not inclined to do so here.

In sum, we conclude that the district court did not clearly err in determining that SCTC was an enterprise of the Tribe that has not waived its immunity. We also conclude that the district court correctly determined that SCTC was not equitably estopped from asserting its immunity due to the misrepresentations of its managers. The district court was correct to conclude that it did not have subject-matter jurisdiction over the plaintiffs' suit against SCTC.

*Individual Defendants' Immunity from Suit*

The plaintiffs also argue that the district court erred in concluding that SCTC's immunity extended to the Individual Defendants. To review, those defendants are Leroy Howard, former Chief of the Seneca-Cayuga Tribe; Floyd Lockamy, former General Manager of SCTC; and Richard Wood, former Plant Manager of SCTC. As the district court noted, all of the allegations made against

15

the Individual Defendants "relate to decisions made and actions taken by them as the 'principal managers' of SCTC." Order, ROA at 396; see Compl., ROA at 11-12 ¶¶ 12, 16-17; id. at 14-15 ¶¶ 32-33, 36, 38. Because all the allegations in the complaint related to actions that the Individual Defendants took in their official capacities, the district court concluded that the Individual Defendants "were acting at all times with at least a colorable claim of authority from the Tribe." Order, ROA at 396 (quotation marks and citations omitted). As a result, the district court concluded that the Tribe's immunity extended to the Individual Defendants as well. We believe that the district court erred in reaching this conclusion.

It is clear that a plaintiff generally may not avoid the operation of tribal immunity by suing tribal officials; "the interest in preserving the inherent right of self-government in Indian tribes is equally strong when suit is brought against individual officers of the tribal organization as when brought against the tribe itself." Nero v. Cherokee Nation of Okla., 892 F.2d 1457, 1462 (10th Cir. 1989) (citation and quotation marks omitted). Accordingly, a tribe's immunity generally immunizes tribal officials from claims made against them in their official capacities.[4] Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir. 1997). The general bar against official-capacity claims, however, does not mean

_____

[4] On appeal, the plaintiffs do not reassert their argument that the Individual Defendants are not tribal officials, so we assume that they qualify as such.

16

that tribal officials are immunized from individual-capacity suits *arising out of* actions they took in their official capacities, as the district court held.  Cf. Russ v. Uppah, 972 F.2d 300, 303 (10th Cir. 1992) ("[S]tate officials may . . . be sued in their individual capacities for actions performed in the course of their official duties and are personally liable for damages awarded.").  Rather, it means that tribal officials are immunized from suits brought against them *because of* their official capacities—that is, because the powers they possess in those capacities enable them to grant the plaintiffs relief on behalf of the tribe.

We again find guidance in cases discussing federal and state sovereign immunity.  Where a suit is brought against the agent or official of a sovereign, to determine whether sovereign immunity bars the suit, we ask whether the sovereign "is the real, substantial party in interest." Frazier v. Simmons, 254 F.3d 1247, 1253 (10th Cir. 2001) (quotation marks and citation omitted).  This "turns on the relief sought by the plaintiffs." Id. (quotation marks and citation omitted).  "[T]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 (1984) (quotation marks and citation omitted).  Where, however, the plaintiffs' suit seeks money damages from the officer "in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself," sovereign immunity does not bar the suit "so long as the relief is sought not from the [sovereign's]

17

treasury but from the officer personally." Alden v. Maine, 527 U.S. 706, 757 (1999).

We need not wade into this swamp, however, because a close reading of the plaintiffs' complaint makes clear that plaintiffs have failed to state a claim against the Individual Defendants in their individual capacities. As a result, the claims asserted against the Individual Defendants are subject to dismissal under Rule 12(b)(6), Fed. R. Civ. P. We therefore affirm the district court's dismissal of the claims against the Individual Defendants, albeit on different grounds. See Medina v. City & County of Denver, 960 F.2d 1493, 1495 n.1 (10th Cir. 1992) ("We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (quotations and citations omitted)).

As stated above, the plaintiffs assert two claims in their complaint: breach of contract and civil conspiracy. However, the breach of contract claim is brought only against SCTC. Compl., ROA at 12. We have affirmed the district court's dismissal of SCTC based on sovereign immunity. Therefore, the breach of contract claim is no longer at issue and only the civil conspiracy claim remains.

The civil conspiracy claim is brought against SCTC and the Individual Defendants. Plaintiffs argued to the district court that their civil conspiracy claim arose under "the Sherman Act, 15 U.S.C. §§ 1, *et seq.*" See Plaintiffs' Brief on

18

Jurisdiction, ROA at 67-68 (acknowledging that their complaint does not recite the Sherman Act by statute number, but that their claim for civil conspiracy should be read as alleging a claim for civil conspiracy under the Sherman Act). Plaintiffs then, however, cite several statutes as supporting their "civil conspiracy" claim. Plaintiffs mention 15 U.S.C. § 1, part of the Sherman Act, which prohibits conspiracies in restraint of trade. Id. at 67-68. Plaintiffs also mention 15 U.S.C. § 13a, part of the Robinson-Patman Act, which prohibits discrimination in rebates, discounts or advertising service charges, and prohibits underselling in particular localities. Id. at 68. Finally, plaintiffs briefly mention 15 U.S.C. § 13, a separate section of the Robinson-Patman Act, which prohibits price discrimination in section 13(a). Id.

However, regardless which statutory section under which the plaintiffs intend to proceed, their claim against the Individual Defendants would not survive a motion to dismiss. Under § 1 of the Sherman Act, civil liability arises out of contracts, combinations, or conspiracies in restraint of trade. 15 U.S.C. § 1. As a result, liability under § 1 requires concerted action. See Gregory v. Fort Bridger Rendezvous Assoc., 448 F.3d 1195, 1200 (10th Cir. 2006) (stating that "unilateral activity, regardless of its anti-competitive effects, is not prohibited by § 1 of the Sherman Act" (internal quotation omitted)). Plaintiffs' complaint included nothing upon which a court could conclude such an agreement existed––there are no allegations that Howard (the former Chief of the Tribe) acted in concert with

19

Lockamy and Wood (former managers of SCTC); nor that Howard conspired with SCTC and the remaining two Individual Defendants. To the contrary, as we stated above, all the allegations made against the Individual Defendants "relate to decisions made and actions taken by them as the 'principal managers' of SCTC," not as individuals. Order, ROA at 396; see Compl., ROA at 11-12 ¶¶ 12, 16-17; id. at 14-15 ¶¶ 32-33, 36, 38. There is simply nothing more than conclusory allegations that a civil conspiracy exists, and this is not enough to satisfy the requirement of "concerted action." See Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (holding that a Sherman Act § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made").

In addition, the operation of the "single-entity rule" leads us to further conclude that the Individual Defendants, who were functioning as officers of a single enterprise, here SCTC, are not separate economic actors who could, by their agreement, give rise to antitrust violations. The "single-entity" rule provides that:

> coordinated activity within a corporation does not represent a plurality of actors necessary to establish concerted action. The Supreme Court has explained that '[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.' Accordingly, 'an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust

20

dangers that § 1 was designed to police.'

Gregory, 448 F.3d at 1200 (quoting Copperweld Corp. v. Independence Tube

Corp., 467 U.S. 752 (1984)).  There is an exception to the general rule, but the

plaintiffs have alleged no facts that would bring their claim within the exception.

See id. (describing a "limited exception to the general rule" where employees of a

corporate employer have an independent personal stake and "stand to benefit from

conspiring with the corporation to restrain trade").  Plaintiffs' complaint fails to

state a claim under § 1.

Section 13a, which is a section of the Robinson-Patman Act, prohibits the

sale of goods "at unreasonably low prices for the purpose of destroying

competition or eliminating a competitor."  15 U.S.C. § 13a.  However, plaintiffs

may not bring a civil claim under § 13a because it is reserved for criminal

enforcement by the Department of Justice.  See Safeway Stores v. Vance, 355

U.S. 389, 389-90 (1958) (holding that no civil action exists for sales at

unreasonably low prices under § 13a); Thomas V. Vakerics, Antitrust Basics §

8.10 (2008) (stating that 15 U.S.C. § 13a "is not considered to be a part of the

'antitrust laws' and a private party cannot sue for treble damages" and that

"[o]nly the Department of Justice has the authority to enforce" the section).

Finally, plaintiffs may not proceed under 15 U.S.C. § 13 under a theory of

price discrimination.  Subsection (a) of § 13 prohibits discrimination in price:

It shall be unlawful for any person engaged in commerce,

21

in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . , and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

15 U.S.C. § 13(a).  Plaintiffs' complaint fails to allege facts that would satisfy the elements of a § 13(a) price discrimination claim.  For example, plaintiffs do not allege any facts showing how any of the Individual Defendants' behavior substantially lessens or injures competition, but rather plaintiffs allege only injury to themselves.

In fact, the plaintiffs' complaint contains none of the allegations necessary to establish a price discrimination claim under 15 U.S.C. § 13(a).  Their complaint's "civil conspiracy" claim does not mention price, let alone that different prices were charged to different SCTC customers––but focuses instead on SCTC's "avoiding state tobacco escrow payments and state taxes."  See Complaint, ROA at 14-16; see also Cont'l Baking Co. v. Old Homestead Bread Co., 476 F.2d 97, 103 (10th Cir. 1973) (defining "price discrimination" as "price differentiation, or the charging of different prices to different customers for goods of like grade and quality").

22

In addition, plaintiffs allege no facts regarding competition in their market or among SCTC's competitors. See Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc., 546 U.S. 164 (2006) (holding that for a plaintiff to establish secondary-line competitive injury, resulting from price discrimination injuring competition among the discriminating seller's customers, the plaintiff must show actual competition with that seller's customers); Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-24 (1993) (holding that for a plaintiff to establish primary-line competitive injury, resulting from a rival's low prices, the plaintiff must show that the prices complained of are below the appropriate measure of the rival's costs and that the rival had a reasonable prospect of recouping its investment in below-cost prices); see also Black Gold, Ltd. v. Rockwool Indus., Inc., 729 F.2d 676, 681 (10th Cir. 1984) (requiring a plaintiff bringing a claim under § 13(a) to show that the price differential had a detrimental effect on competition).

Because the plaintiffs have failed to allege a viable civil conspiracy claim against the Individual Defendants in their individual capacities, we affirm the district court's dismissal of the claims against the Individual Defendants, albeit on different grounds than those stated by the district court.

III

We AFFIRM the district court's order dismissing plaintiffs' claims.

23