FILED
United States Court of Appeals
Tenth Circuit

April 27, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BOB BURRELL; SUSAN BURRELL,

      Plaintiffs - Appellees/
      Cross - Appellants,

    v.

LEONARD ARMIJO, Governor of
Santa Ana Pueblo and Acting Chief of
the Santa Ana Tribal Police,

      Defendant - Appellant,

LAWRENCE MONTOYA, Lt. Governor
of Santa Ana Pueblo,

      Defendant -
      Cross - Appellee,

   and

NATHAN TSOSIE, Tribal
Administrator of Santa Ana Pueblo;
JERRY KINSMAN, Farm Administrator
of Santa Ana Pueblo, SANTA ANA
PUEBLO,

      Defendants.

Nos. 09-2034, 09-2039, 09-2154

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D. Ct. No. 1:02-CV-00542-WJ-RHS)**

Richard W. Hughes (Donna M. Connolly, with him on the briefs), Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, Santa Fe, New Mexico, appearing for Appellant and Cross-Appellee.

Chris Lucero, Jr., Albuquerque, New Mexico, appearing for Appellees/Cross-Appellants.

Before **TACHA**, **EBEL**, and **KELLY**, Circuit Judges.

**TACHA**, Circuit Judge.

A jury found Santa Ana Pueblo Governor Leonard Armijo and Lieutenant Governor Lawrence Montoya liable for discriminating and conspiring to discriminate against the plaintiffs, Bob and Susan Burrell, in violation of 42 U.S.C. §§ 1981 and 1985. Thereafter, Governor Armijo and Lieutenant Governor Montoya filed a motion for judgment as a matter of law based in part on sovereign immunity. The district court denied the motion as to Governor Armijo but granted it as to Lieutenant Governor Montoya. The district court then awarded the Burrells attorney's fees as prevailing parties against Governor Armijo. *See* 42 U.S.C. § 1988(b).

Governor Armijo now appeals the denial of his motion for judgment as a matter of law and the award of attorney's fees. The Burrells cross-appeal the district court's grant of judgment as a matter of law to Lieutenant Governor Montoya and a prior order of the court striking portions of their complaint under

-2-

Fed. R. Civ. P. 12(f).  Taking jurisdiction under 28 U.S.C. § 1291, we conclude that both Governor Armijo and Lieutenant Governor Montoya are entitled to immunity.  We further find no error in the order striking portions of the complaint.  Finally, because the Burrells are no longer prevailing parties, they are not eligible for § 1988(b) attorney's fees.  Thus, we REVERSE in part and AFFIRM in part.

## I. BACKGROUND

The evidence at trial demonstrated the following.  On May 20, 1980, Mr. Burrell entered into a ten-year land lease with the Santa Ana Pueblo under which the Pueblo leased him nearly 172 acres in exchange for specified annual payments.  The lease was later extended to September 2000.  Although Mr. Burrell and the Santa Ana Pueblo were the only parties to the lease, the contract was drawn on a standard form under the authority of the United States Department of the Interior, Bureau of Indian Affairs ("BIA") and approved by the same agency.  The lease contained a provision that upon the termination or expiration of the lease, all buildings and improvements placed on the land by Mr. Burrell would become the property of the Santa Ana Pueblo.  In addition, the lease authorized the BIA to perform the following functions: to suspend rental payment when the leased land is held in trust; to approve subleases, assignments, or amendments to the lease; to resolve the amount of damages in the event of an oil and gas or right-of-way dispute; to notify the parties of the termination of

-3-

federal trust responsibilities with respect to the land; to authorize or prohibit alfalfa plowing during the last year of the lease contract; to plan a soil conservation program and demand specific performance of the program or payment of specified damages; and to enter and inspect the land.

On the evening of June 1, 1997, the Burrells were baling alfalfa on the leased land. Mr. Burrell's practice, as well as standard practice in the area, was to bale alfalfa between 9 p.m. and 7 a.m. to ensure that the alfalfa would have the proper moisture content. That night, a member of the Santa Ana Pueblo phoned Governor Armijo and complained about noise coming from the Burrells' alfalfa baling operations. Governor Armijo drove to the Burrells' land, told them that they were making too much noise, and said that they must stop baling or he would arrest them.

At the Burrells' request, Governor Armijo put the no-nighttime-baling order in writing the following day. The order was written on Santa Ana Pueblo letterhead and stated: "The Pueblo of Santa Ana is requiring that you do not bale hay between the hours of 9:00 pm and 7:00 am." The order was concluded, "Sincerely, Pueblo of Santa Ana" and was signed by Governor Armijo.

The Burrells believed that without nighttime baling, their alfalfa operation would fail. Accordingly, Mr. Burrell tried to contact Governor Armijo, Lieutenant Governor Montoya, and other tribal officials in order to schedule a meeting with the Santa Ana Pueblo Tribal Council so that he could attempt to

-4-

persuade it to rescind the order.  These attempts to have the order rescinded, however, were unsuccessful.

During this time, the Burrells also met with Lieutenant Governor Montoya. At this meeting, Mr. Burrell suggested that the Santa Ana Pueblo could buy him out of the lease for $500,000.  Lieutenant Governor Montoya told Mr. Burrell that he would raise the issue with the Santa Ana Tribal Council.

The Burrells consulted with a lawyer who sent a letter addressed to the Santa Ana Tribal Council on June 18.  The letter read:

> Unfortunately and regretfully, after seventeen years of hard work and dedication, a situation has arisen in Mr. Burrell's current situation which will make it virtually impossible for Mr. Burrell to continue farming as a profession. . . . The situation which has arisen includes but is not limited to the incidents regarding the letter of Governor Leonard Armijo attached hereto . . . .
>
> Mr. Burrell still has a loan through the Farm Home Administration on the equipment he has purchased over the years to accomplish the task of farming the subject land.  Mr. Burrell will have to liquidate the equipment to satisfy the lien of the Farm Home Administration.
>
> It is my understanding that the crop mix that Mr. Burrell has planted on the subject land is in various stages of growth and will be ready for harvesting and grazing in the near future.  It is also my understanding that the crops will be lost if someone does not take over maintenance of the crops as soon as possible after Mr. Burrell vacates the farming operation.  Mr. Burrell has indicated that he feels that the current crop and future crop produced by the land will be prosperous and sell for fair market values if properly maintained and harvested.
>
> . . . Mr. Burrell hereby formally requests the Tribal Council to purchase his interest in the remaining term of the lease and compensate him for the capital improvements he has placed on the

land such as laser leveling, improved irrigation facilities, prime crops in progress and his conscientious care of the land over the last seventeen years.

On July 10, the Tribal Council held a meeting. The written agenda for the meeting included an item titled "Bob Burrell request to enter into negotiations regarding termination of lease." This agenda item was included in response to Lieutenant Governor Montoya's meeting with the Burrells and the Burrells' June 18 letter. At the meeting, the Tribal Council created a committee, which included Lieutenant Governor Montoya but did not include Governor Armijo, to address the Burrells' concerns. Lieutenant Governor Montoya understood the purpose of the committee was to negotiate terms for the termination of the Burrells' lease.

In July and August, Lieutenant Governor Montoya and another member of the committee noticed the Burrells' crops appeared not to have been irrigated, and they hired a third party to bale and haul away some of the Burrells' crops. Mr. Burrell testified that this was done without his permission. Lieutenant Governor Montoya testified, however, that this action was undertaken because the Burrells' letter had told the Tribal Council to take care of their crops.

On August 5, Governor Armijo wrote to the BIA, explaining that Mr. Burrell was the lessee of Santa Ana lands under a lease approved by the BIA; that Mr. Burrell had advised him that he did not intend to continue with the lease and requested the Santa Ana Pueblo to cut the existing crop, which the Pueblo had done; that improvements to the land would become the property of the Pueblo on

termination or expiration of the lease and thus the Pueblo would not compensate Mr. Burrell for such improvements; and that the BIA should take whatever steps necessary to terminate or enforce the lease based on Mr. Burrell's abandonment, including exercising the Pueblo's rights under the payment bond required under the lease.

The BIA responded by letter, stating that the agency had completed an inspection of the leased lands on August 27 and found Mr. Burrell to be in compliance with the provisions of the lease regarding soil conservation and the prohibition on alfalfa plowing during the last year of the lease contract,[1] and that no damages could be assessed under that provision. The BIA further noted that Mr. Burrell had expected to recoup $9,750 in the years remaining on the lease for certain expenditures he had incurred out of his personal funds. The BIA ended the letter by explaining that the Santa Ana Pueblo should consider all that information in deciding on a fair settlement.

The Burrells moved from the land in late August or early September. Thereafter, Mr. Burrell met at least twice with members of the committee appointed to negotiate with him, including at least once with Lieutenant Governor Montoya. At the second meeting, which occurred on September 23, committee members provided Mr. Burrell with a proposed resolution that they were planning

---

[1]As the lease was set to expire in September 2000, this provision did not apply to Mr. Burrell at the time.

on submitting to the Tribal Council if the terms were satisfactory to Mr. Burrell. The resolution provided that the Santa Ana Pueblo would pay off Mr. Burrell's Farm Home Administration Loan,[2] waive the $15,000 in water charges that were due to the BIA, hire Mr. Burrell as a farm consultant for three years, and pay for Mr. Burrell's moving expenses. Mr. Burrell verbally accepted those terms, and the Tribal Council passed the resolution on September 24.

After Mr. Burrell had indicated his agreement with the proposed terms, however, he met with an attorney and thereafter decided that the terms were not satisfactory. The attorney sent a letter at the Burrells' request to the Santa Ana Pueblo on September 25. The letter contended that the Pueblo had violated the Burrells' constitutional rights by taking their property without due process and had subjected them to emotional abuse in the negotiation process, and the letter stated that the attorney was preparing for a federal lawsuit.

This lawsuit ensued. The Burrells' complaint raises claims against the Santa Ana Pueblo, Governor Armijo, and Lieutenant Governor Montoya[3] for violations of their civil rights under 42 U.S.C. §§ 1981, 1983, and 1985, as well as claims for breach of a federal farm lease and "respondeat superior." *See*

---

[2]In his brief, Lieutenant Governor Montoya states that the principal balance on the loan was more than $200,000, but he does not support that claim with a citation to the record.

[3]Other individual tribal officials are also named, but they have since been dismissed and are not relevant to this appeal.

*Burrell v. Armijo*, 456 F.3d 1159, 1161 (10th Cir. 2006). The district court initially dismissed all the Burrells' claims because the court gave preclusive effect to a ruling from the Santa Ana Pueblo Tribal Court that the Pueblo and individual defendants were entitled to sovereign immunity. *See id.* On appeal, we rejected the court's use of preclusion but independently concluded that the Santa Ana Pueblo was entitled to sovereign immunity. *Id.* at 1162, 1173, 1174. We further concluded that the Burrells' complaint sufficiently alleged that Governor Armijo and Lieutenant Governor Montoya were not immune from suit by stating that prior to September, the Tribal Council had passed a resolution to buy out the Burrells for $500,000 but Governor Armijo and Lieutenant Governor Montoya had, in excess of their authority, refused to effectuate this resolution, and instead attempted themselves to negotiate with the Burrells for less money. We therefore remanded the § 1981 and § 1985 claims against Governor Armijo and Lieutenant Governor Montoya to the district court for further consideration.[4]

On remand, Governor Armijo and Lieutenant Governor Montoya moved to dismiss these remaining claims on the basis that their actions were within the scope of their tribal authority and thus protected by sovereign immunity. The district court denied the motion, suggesting that the Burrells' allegations in their complaint that Governor Armijo and Lieutenant Governor Montoya ignored the

[4]We also determined that the Burrells failed to state a § 1983 or breach of lease claim and therefore affirmed the district court's dismissal of those two claims. *Burrell*, 456 F.3d at 1174–75.

-9-

Tribal Council's resolution were sufficient to establish that they had not acted within their official authority.

The case then went to trial. During the Burrells' case-in-chief, the district court excluded the Burrells' evidence regarding their allegations that the defendants had refused to carry out an alleged resolution of the Tribal Council prior to the September resolution. Thus, the evidence at trial established only that Governor Armijo ordered the Burrells to stop baling alfalfa during the night, and that Lieutenant Governor Montoya played a role in taking the Burrells' crops after the June 18 letter and also took part in negotiations with Mr. Burrell that culminated in the Tribal Council's September resolution.

The jury found both defendants had violated the Burrells' rights under § 1981 and had conspired to violate those rights in violation of § 1985(3). The jury awarded the Burrells $347,000 in compensatory damages and $1 million in punitive damages. Thereafter, Governor Armijo and Lieutenant Governor Montoya filed a joint motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). The motion argued that the evidence showed that both defendants' actions were within their authority as tribal officials and they were therefore protected from suit by the doctrine of sovereign immunity. The motion further contended that the evidence was insufficient to establish the Burrells' substantive claims under § 1981 and § 1985 and did not support the punitive or compensatory damages award.

The district court largely denied the motion as to Governor Armijo, concluding that he was not entitled to sovereign immunity, sufficient evidence supported the Burrells' § 1981 discrimination claim, and the damages award was appropriate; the court, however, granted judgment as a matter of law to Governor Armijo on the Burrells' § 1985(3) conspiracy claim. The court granted judgment as a matter of law to Lieutenant Governor Montoya on all of the Burrells' claims, reasoning that he was entitled to sovereign immunity and that the evidence was insufficient to support liability against him under § 1981 or § 1985. Finally, the district court awarded the Burrells attorney's fees as prevailing parties against Governor Armijo in the amount of $160,875. *See* 42 U.S.C. § 1988(b).

Governor Armijo now appeals the denial of his motion for judgment as a matter of law, contending that he is entitled to sovereign immunity and that the evidence does not support the jury's finding as to liability or damages. The Burrells cross-appeal the district court's grant of judgment as a matter of law to Lieutenant Governor Montoya. The Burrells also cross-appeal the district court's earlier decision to strike portions of their complaint under Fed. R. Civ. P. 12(f). Finally, Governor Armijo appeals the award of attorney's fees.

## II. ANALYSIS

A.    Motion for Judgment as a Matter of Law Based on Sovereign Immunity

We review de novo the district court's decision on a Rule 50(b) motion for judgment as a matter of law. *See Wagner v. Live Nation Motor Sports, Inc.*, 586

-11-

F.3d 1237, 1243 (10th Cir. 2009). A party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the non-moving party, reveals no legally sufficient evidentiary basis to find for the non-moving party. *See id.* at 1244; *Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 494, 499 (10th Cir. 1984) (judgment as a matter of law may be entered "only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in [the moving party]'s favor").

"As sovereign powers, federally-recognized Indian tribes possess immunity from suit in federal court." *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1292 (10th Cir. 2008). Tribal sovereign immunity generally extends to tribal officials acting within the scope of their official authority. *See id.* at 1296 ("[A] tribe's immunity generally immunizes tribal officials from claims made against them in their official capacities."). On the other hand, a tribe's "sovereign immunity does not extend to an official when the official is acting as an individual or outside the scope of those powers that have been delegated to him." *Burrell v. Armijo*, 456 F.3d 1159, 1174 (10th Cir. 2006) (quotations omitted). Thus, the immunity question hinges on the breadth of official power the official enjoys and not whether the official is charged with using that power tortiously or wrongfully. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 692–93 (1949); *Wyoming v. United States*, 279 F.3d 1214, 1229 (10th Cir. 2002); *Tenneco Oil Co. v. Sac & Fox Tribe of Indians*

*of Okla.*, 725 F.2d 572, 576 (10th Cir. 1984) (McKay, J., concurring).

1.    *Governor Armijo*

The only conduct of Governor Armijo at issue in this case is his verbal and written order to the Burrells not to bale alfalfa between 9 p.m. and 7 a.m. The district court determined that Governor Armijo was not entitled to sovereign immunity and denied his motion for judgment as a matter of law under Rule 50(b), apparently reasoning that in issuing the no-baling order, he acted without the approval of the Tribal Council or the BIA. On appeal, Governor Armijo argues that he acted within the scope of his authority as a Pueblo official when he told the Burrells to stop their nighttime baling, and thus he is protected by the Pueblo's sovereign immunity. He contends that he was acting within his authority because he was responding to a Pueblo member's complaint about the noise and was doing so as Governor to essentially keep the peace.

The only unequivocal evidence at trial regarding whether Governor Armijo had the power to order the Burrells to stop baling alfalfa at night was the testimony of Juan Montoya, the tribal religious leader, who stated that Governor Armijo acted within his authority when he issued the no-baling directive:

> Q: Can you tell us whether, based on your knowledge of the governor's position at Santa Ana [Pubelo], a directive like that to the Burrells would be something that's within the governor's authority to carry out?
> A:    Yes.

Mr. Montoya's testimony was consistent with that of Governor Armijo

-13-

himself, who testified that the tribal governor is a sort of jack-of-all-trades.

Governor Armijo testified: "Being a tribal governor, you're the commander in chief. You're also a dogcatcher. You're also a marriage counselor. You just about hold any position, I guess you would say, within the tribe." He further explained that his position dealt with "problems that members of the pueblo have within the village," which Mr. Montoya testified included the noise complaint on June 1, 1997. Indeed, Mr. Burrell himself acknowledged that the tribal governor had fairly broad power to deal with internal matters within Pueblo land, and that the no-baling order was within Governor Armijo's power and authority.

Undisputed evidence regarding the structure of the Pueblo's government and how decisions were made further support the conclusion that Governor Armijo had the authority to issue the no-baling order. Evidence at trial generally demonstrated that the governor oversaw all regulatory and business matters within the Pueblo. This was consistent with testimony from both the Burrells that only actual officials within the Pueblo, as opposed to the Tribal Council, wielded any power. Thus, to the extent that the Tribal Council disagreed with any decision of the governor, the Tribal Council could later "rescind" the decision, or "direct [the governor] to undo it or change it." In this way, the Tribal Council had the authority to make the "final decision" on any agreements or transactions that came through the tribal office.

Given this decisionmaking framework, the Burrells testified that they

-14-

repeatedly sought to "appeal" Governor Armijo's decision to the Tribal Council so that the Council would rescind or change it. Mr. Burrell testified that he talked with every Tribal Council member he came in contact with in order to have a Tribal Council meeting scheduled. Despite the fact that "everybody" knew about the no-baling directive, including members of the Tribal Council, no efforts were made to rescind the directive. To the contrary, there was testimony at trial that Governor Armijo reported what he had done to the Tribal Council and that the council found that action to be reasonable. Mr. Burrell testified that he ultimately gave up trying to talk to tribal officials about the baling order. Despite the Burrells' best efforts, the Tribal Council refused to lift the baling restriction until after they had moved off Pueblo land.

This evidence leads only to one reasonable conclusion: Governor Armijo acted within his authority as a tribal official when he issued the no-baling order. First, Mr. Montoya explicitly testified on this point. Second, the evidence relating to the structure of the Pueblo's government and how decisions were made demonstrates that Governor Armijo had the authority to issue the no-baling directive. Although the Tribal Council could "rescind" such an order after the fact through an "appeal" to the Council, no evidence was presented that suggested the governor did not have the initial power to act in the first place. Moreover, the evidence suggests that the Tribal Council was aware of the order and either expressly approved it as "reasonable" or at the very least took no action to change

-15-

it, which demonstrates the Council's implicit approval of the action after the fact.

The Burrells rely heavily on a portion of testimony from Tribal Council member Manuel Christobal to support their position that Governor Armijo was acting outside the bounds of his authority. A reasonable jury, however, could not interpret Mr. Christobal's testimony in this manner. The Burrells point to the following exchange between counsel and Mr. Christobal:

> Q:    Were the Burrells treated fairly by Governor Armijo?
> A:    In my opinion at the time, it was an issue that was—shouldn't have happened. You would have to look at the accountability of the leadership at the time. It was cocky, meaning they were irresponsible. Burrell's lease was going to end, and it would have been honorable within the Tribal Council to wait till the terms of the lease agreement came before the council, and the council would have made a decision whether to continue the lease agreement, but this type of behavior, in my opinion, was unjust. It was an issue that shouldn't have happened. It was—it was random, you know?

This evidence is not at odds with the testimony from Mr. Montoya that Governor Armijo had the power to issue the no-baling directive. Nor does it call into question the evidence regarding the Pueblo's framework of governance. To begin, it is unclear whether this testimony even refers to the actions of Governor Armijo, as opposed to the actions of the Tribal Council. And in any event, to the extent that Mr. Christobal opined that Governor Armijo's action was "unjust," "random," "irresponsible," or not "honorable," such statements cannot be interpreted to mean that the action was undertaken outside the scope of the governor's authority. Rather, this testimony suggests only that the *substance* of

-16-

the order was not fair or did not comport with the Pueblo's usual practices—an issue entirely distinct from the question of whether the governor's position authorized him to issue such orders at all. *See Larson*, 337 U.S. at 692–93; *Wyoming*, 279 F.3d at 1229; *Tenneco Oil Co.*, 725 F.2d at 576 (McKay, J., concurring).[5]

The Burrells also suggest, as did the district court, that only the BIA could have ordered them to stop baling during the evening hours. No evidence at trial supports this suggestion. First, although the evidence showed that the BIA administered the Burrells' lease, there was no evidence that this power included the authority to regulate the Burrells' alfalfa baling hours or precluded Governor Armijo from doing so himself. To the contrary, the lease authorized the BIA to perform the following functions: to suspend rental payment when the leased land is held in trust; to approve subleases, assignments, or amendments to the lease; to resolve the amount of damages in the event of an oil and gas or right-of-way dispute; to notify the parties of the termination of federal trust responsibilities with respect to the land; to authorize or prohibit alfalfa plowing during the last year of the lease contract; to plan a soil conservation program and demand specific performance of the program or payment of specified damages; and to enter and inspect the land. At trial, there was no evidence that these provisions

---

[5]For the same reason, the district court erred insofar as it suggested that Governor Armijo could not have been acting within his lawful authority if he was discriminating against the Burrells.

included the right to regulate the Burrells' alfalfa baling hours or that the provisions precluded Governor Armijo from issuing the no-baling order.

The Burrells point to the testimony of the BIA's soil conservationist, Clyde Sandoval, who testified that he "would check the compliance" of BIA farming leases, which included looking at the care of natural resources on the land, fertilizer use, crop rotation, and construction of fences. Mr. Sandoval's testimony, however, does not suggest that the BIA was charged with resolving disputes as to when alfalfa could be baled.

The Burrells further point to a federal regulation they contend authorized the BIA to "respond to concerns" of the tribe and resolve conflicts, but the Burrells do not show when (if at all) evidence of this regulation and its applicability to the Burrells' lease was presented during trial. Finally, and in any event, the regulation does not support the conclusion that a tribal governor could not limit a land lessee's baling hours; the regulation relates only to the BIA's responsibilities regarding payment obligations and operating requirements in a lease, neither of which, in the Burrell lease, speaks to the issue of alfalfa baling hours.[6]

_____

[6]25 C.F.R. § 162.108 is titled "What are BIA's responsibilities in administering and enforcing leases" and provides:

(a) We will ensure that tenants meet their payment obligations to Indian landowners, through the collection of rent on behalf of the landowners and the prompt initiation of appropriate collection and

(continued...)

Because the trial evidence supports only the conclusion that Governor Armijo acted within the scope of his authority as a Pueblo official when he issued the no-baling directive, the district court erred in denying his motion for judgment as a matter of law based on sovereign immunity. *See Keylon v. City of Albuquerque*, 535 F.3d 1210, 1215–16 (10th Cir. 2008) (concluding that a party is entitled to judgment as a matter of law when there are no genuine issues of fact as to whether the defendant is entitled to immunity). We therefore reverse the court on that issue and do not reach Governor Armijo's additional claims on appeal.

2.      *Lieutenant Governor Montoya*

The evidence at trial showed that Lieutenant Governor Montoya visited with the Burrells in early June to discuss how to resolve their dilemma, was appointed by the Tribal Council as part of a committee to negotiate with the Burrells for a buyout of their lease, and later hired a third party which baled and

---

[6](...continued)
enforcement actions. We will also assist landowners in the enforcement of payment obligations that run directly to them, and in the exercise of any negotiated remedies that apply in addition to specific remedies made available to us under these or other regulations.

(b) We will ensure that tenants comply with the operating requirements in their leases, through appropriate inspections and enforcement actions as needed to protect the interests of the Indian landowners and respond to concerns expressed by them. We will take immediate action to recover possession from trespassers operating without a lease, and take other emergency action as needed to preserve the value of the land.

hauled away some of the Burrells' crops when it appeared that the fields had been abandoned. The district court determined that Lieutenant Governor Montoya was acting within the scope of his authority because the Burrells had given him permission to do so in their June 18 letter to the Tribal Council.

On appeal, the Burrells do not argue that their letter did not authorize Lieutenant Governor Montoya to harvest their crops. Instead, the portion of the Burrells' brief on appeal relating to the sovereign immunity issue focuses primarily on the actions of Governor Armijo. Without specific and reasoned argument as to why the district court erred in granting Lieutenant Governor Montoya's motion for judgment as a matter of law, we have no basis to reverse the district court's decision. *See United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995) (on appeal, issues nominally raised but inadequately briefed need not be considered).[7]

B.    Striking Portions of the Burrells' Complaint

After we remanded to the district court for consideration of the Burrells' § 1981 and § 1985 claims against Governor Armijo and Lieutenant Governor Montoya, the district court granted the defendants' motion under Fed. R. Civ. P. 12(f) and struck several paragraphs of the complaint. *See* Fed. R. Civ. P. 12(f)

---

[7]Because we do not disturb the order granting sovereign immunity to Lieutenant Governor Montoya, we do not consider the Burrells' additional claim that the district court erred in granting him judgment as a matter of law on the Burrells' § 1981 discrimination and § 1985(3) conspiracy claims based on the insufficiency of the evidence.

(authorizing a court to strike any portion of a pleading that is "redundant, immaterial, impertinent, or scandalous"). On appeal, the Burrells argue that the district court erred in granting the motion to strike because the stricken paragraphs are related to their claims. We have thoroughly reviewed the portion of the complaint at issue and conclude that none of it is relevant to the question of sovereign immunity, the resolution of which moots the parties' appellate arguments on the § 1981 and § 1985 claims. In addition, the Burrells do not argue that the order prejudiced them in their presentation of evidence at trial. Accordingly, even if the court erred in striking portions of the complaint—which we do not suggest—any error was harmless.

## C.    Attorney's Fees

Because the district court's denial of Governor Armijo's motion for judgment as a matter of law left intact the jury's verdict against him on the Burrells' § 1985 discrimination claim, the court found that the Burrells were "prevailing parties" and awarded them $160,875 in attorney's fees under 42 U.S.C. § 1988(b). Governor Armijo appeals the fee award, contending that if this Court reverses the district court's decision refusing to grant him judgment as a matter of law and does not grant the Burrells any of the relief they request in their cross-appeal (conditions which have now been satisfied), then the Burrells would no longer be prevailing parties eligible for attorney's fees. *See Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992) ("[A] plaintiff 'prevails' [for purposes of § 1988(b)]

-21-

when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."); *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.") (quotations omitted); *see also Ballard v. Muskogee Reg'l Med. Ctr.*, 238 F.3d 1250, 1254 (10th Cir. 2001) ("[W]hen a claim of free speech retaliation under § 1983 is reversed on the merits, the court must also reverse an award of attorney fees [under § 1988(b)] to the plaintiff."). The Burrells do not present any argument to the contrary. Accordingly, we reverse the fee award.

### III. CONCLUSION

The portion of the district court's order denying judgment as a matter of law to Governor Armijo on the basis of sovereign immunity is REVERSED. The portion of the order granting judgment as a matter of law to Lieutenant Governor Montoya on the same basis is AFFIRMED. We further AFFIRM the order striking portions of the Burrells' complaint. Finally, we REVERSE the order of the district court awarding the Burrells attorney's fees.