Justice SCALIA, dissenting.
In Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), this Court expanded the judge-invented doctrine of tribal immunity to cover off-reservation commercial activities. Id., at 760, 118 S.Ct. 1700. I concurred in that decision. For the reasons given today in Justice THOMAS's dissenting opinion, which I join, I am now convinced that Kiowa was wrongly decided; that, in the intervening 16 years, its error has grown more glaringly obvious; and that stare decisis does not recommend its retention. Rather than insist that Congress clean up a mess that I helped make, I would overrule Kiowa and reverse the judgment below.
Justice THOMAS, with whom Justice SCALIA, Justice GINSBURG, and Justice ALITO join, dissenting.
In Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), this Court extended the judge-made doctrine of tribal sovereign immunity to bar suits arising out of an Indian tribe's commercial activities conducted outside its territory. That was error. Such an expansion of tribal immunity is unsupported by any rationale for that doctrine, inconsistent with the limits on tribal sovereignty, and an affront to state sovereignty.
That decision, wrong to begin with, has only worsened with the passage of time. In the 16 years since Kiowa, tribal commerce has proliferated and the inequities engendered by unwarranted tribal immunity have multiplied. Nevertheless, the Court turns down a chance to rectify its *2046 error. Still lacking a substantive justification for Kiowa 's rule, the majority relies on notions of deference to Congress and stare decisis . Because those considerations do not support (and cannot sustain) Kiowa 's unjustifiable rule and its mounting consequences, I respectfully dissent. *815 I
A
There is no substantive basis for Kiowa 's extension of tribal immunity to off-reservation commercial acts. As this Court explained in Kiowa, the common-law doctrine of tribal sovereign immunity arose "almost by accident." Id., at 756, 118 S.Ct. 1700. The case this Court typically cited as the doctrine's source "simply does not stand for that proposition," ibid. (citing Turner v. United States, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919) ), and later cases merely "reiterated the doctrine" "with little analysis," 523 U.S., at 757, 118 S.Ct. 1700. In fact, far from defending the doctrine of tribal sovereign immunity, the Kiowa majority "doubt[ed] the wisdom of perpetuating the doctrine." Id., at 758, 118 S.Ct. 1700. The majority here suggests just one post hoc justification: that tribes automatically receive immunity as an incident to their historic sovereignty. But that explanation fails to account for the fact that immunity does not apply of its own force in the courts of another sovereign. And none of the other colorable rationales for the doctrine-i.e ., considerations of comity, and protection of tribal self-sufficiency and self-government-supports extending immunity to suits arising out of a tribe's commercial activities conducted beyond its territory.
1
Despite the Indian tribes' subjection to the authority and protection of the United States Government, this Court has deemed them "domestic dependent nations" that retain limited attributes of their historic sovereignty. Cherokee Nation v. Georgia, 5 Pet. 1, 17, 8 L.Ed. 25 (1831) ; see also United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) ("The sovereignty that the Indian tribes retain is of a unique and limited character"). The majority suggests that tribal immunity is one such attribute of sovereignty that tribes have retained. See ante, at 2030; Brief for Respondent Bay Mills Indian Community 48; On that view, immunity from suit applies automatically *816 , on the theory that it is simply " inherent in the nature of sovereignty," The Federalist No. 81, p. 548 (J. Cooke ed. 1961).
This basis for immunity-the only substantive basis the majority invokes-is unobjectionable when a tribe raises immunity as a defense in its own courts. We have long recognized that in the sovereign's own courts, "the sovereign's power to determine the jurisdiction of its own courts and to define the substantive legal rights of its citizens adequately explains the lesser authority to define its own immunity." Kiowa, supra, at 760, 118 S.Ct. 1700 (Stevens, J., dissenting) (citing Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834 (1907) ). But this notion cannot support a tribe's claim of immunity in the courts of another sovereign-either a State (as in Kiowa ) or the United States (as here). Sovereign immunity is not a freestanding "right" that applies of its own force when a sovereign faces suit in the courts of another. Republic of Austria v. Altmann, 541 U.S. 677, 688, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Rather, "[t]he sovereign's claim to immunity in the courts of a second sovereign ... normally depends on the second sovereign's law." Kiowa,supra, at 760-761, 118 S.Ct. 1700 (Stevens, J., dissenting); see, e.g., *2047 Altmann, supra, at 711, 124 S.Ct. 2240 (BREYER, J., concurring) (application of foreign sovereign immunity "is a matter, not of legal right, but of 'grace and comity' ").[1] In short, to the extent an Indian tribe may claim immunity in federal or state court, it is *817 because federal or state law provides it, not merely because the tribe is sovereign. Outside of tribal courts, the majority's inherent-immunity argument is hardly persuasive.
2
Immunity for independent foreign nations in federal courts is grounded in international "comity," Verlinden B. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), i.e., respecting the dignity of other sovereigns so as not to " ' "imperil the amicable relations between governments and vex the peace of nations," ' " Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 418, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). But whatever its relevance to tribal immunity, comity is an ill-fitting justification for extending immunity to tribes' off-reservation commercial activities. Even with respect to fully sovereign foreign nations, comity has long been discarded as a sufficient reason to grant immunity for commercial acts. In 1976, Congress provided that foreign states are not immune from suits based on their "commercial activity" in the United States or abroad. Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2) ; see also Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 703-704, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality opinion of White, J., joined by Burger, C. J., and Powell and Rehnquist, JJ.) ("Subjecting foreign governments to the rule of law in their commercial dealings" is "unlikely to touch very sharply on 'national nerves,' " because "[i]n their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns").
There is a further reason that comity cannot support tribal immunity for off-reservation commercial activities. At bottom, comity is about one sovereign respecting the dignity of another. See Nevada v. Hall, 440 U.S. 410, 416, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979). But permitting immunity for a tribe's off-reservation acts represents a substantial affront to a different set of sovereigns-the States, whose sovereignty is guaranteed by the Constitution, see New York v. United States, 505 U.S. 144, 188, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)
*818 ("The Constitution ... 'leaves to the several States a residuary and inviolable sovereignty' " (quoting The Federalist No. 39, at 256)). When an Indian tribe engages in commercial activity outside its own territory, it necessarily acts within the territory of a sovereign State. This is why, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-149, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). A rule barring all suits against a tribe arising out of a tribe's conduct within state territory- *2048 whether private actions or (as here) actions brought by the State itself-stands in stark contrast to a State's broad regulatory authority over Indians within its own territory. Indeed, by foreclosing key mechanisms upon which States depend to enforce their laws against tribes engaged in off-reservation commercial activity, such a rule effects a breathtaking pre-emption of state power. Kiowa, 523 U.S., at 764, 118 S.Ct. 1700 (Stevens, J., dissenting). What is worse, because that rule of immunity also applies in state courts, it strips the States of their prerogative "to decide for themselves whether to accord such immunity to Indian tribes as a matter of comity." Id., at 760, 118 S.Ct. 1700 (same). The States may decide whether to grant immunity in their courts to other sovereign States, see Hall, supra, at 417-418, 99 S.Ct. 1182 (a State's immunity from suit in the courts of a second State depends on whether the second has chosen to extend immunity to the first "as a matter of comity"), but when it comes to Indian tribes, this Court has taken that right away. Kiowa, supra, at 765, 118 S.Ct. 1700 (Stevens, J., dissenting).
Nor does granting tribes immunity with respect to their commercial conduct in state territory serve the practical aim of comity: allaying friction between sovereigns. See Banco Nacional de Cuba, supra, at 417-418, 84 S.Ct. 923. We need look no further than this case (and many others cited by petitioner and amici States) to see that such broad immunity has only aggravated *819 relationships between States and tribes throughout the country. See infra, at 2051 - 2052; see generally Brief for State of Alabama et al. 11-16; Brief for State of Oklahoma 8-10, 12-15.
3
This Court has previously suggested that recognizing tribal immunity furthers a perceived congressional goal of promoting tribal self-sufficiency and self-governance. See Kiowa,supra, at 757, 118 S.Ct. 1700; Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C., 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986). Whatever the force of this assertion as a general matter, it is easy to reject as a basis for extending tribal immunity to off-reservation commercial activities. In Kiowa itself, this Court dismissed the self-sufficiency rationale as "inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities." 523 U.S., at 757-758, 118 S.Ct. 1700. The Court expressed concern that "[i]n this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." Id., at 758, 118 S.Ct. 1700.
Nor is immunity for off-reservation commercial acts necessary to protect tribal self-governance. As the Kiowa majority conceded, "[i]n our interdependent and mobile society, ... tribal immunity extends beyond what is needed to safeguard tribal self-governance." Ibid. Such broad immunity far exceeds the modest scope of tribal sovereignty, which is limited only to "what is necessary to protect tribal self-government or to control internal relations." Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) ; see also Nevada v. Hicks, 533 U.S. 353, 392, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (O'Connor, J., concurring in part and concurring in judgment) ("[T]ribes retain sovereign interests in activities that occur on land owned and controlled by the tribe ..."). And no party has suggested that immunity from the isolated suits that may arise out of extraterritorial commercial dealings is somehow fun *2049 damental *820 to protecting tribal government or regulating a tribe's internal affairs.
B
Despite acknowledging that there is scant substantive justification for extending tribal immunity to off-reservation commercial acts, this Court did just that in Kiowa. See 523 U.S., at 758, 118 S.Ct. 1700. The Kiowa majority admitted that the Court-rather than Congress-"has taken the lead in drawing the bounds of tribal immunity." Id., at 759, 118 S.Ct. 1700. Nevertheless, the Court adopted a rule of expansive immunity purportedly to "defer to the role Congress may wish to exercise in this important judgment." Id., at 758, 118 S.Ct. 1700.
This asserted "deference" to Congress was a fiction and remains an enigma, however, because the Kiowa Court did not actually leave to Congress the decision whether to extend tribal immunity. Tribal immunity is a common-law doctrine adopted and shaped by this Court. Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 510, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) ; Kiowa, 523 U.S., at 759, 118 S.Ct. 1700. Before Kiowa, we had never held that tribal sovereign immunity applied to off-reservation commercial activities.[2] Thus, faced with an unresolved question about a common-law doctrine of its own design, the Kiowa Court had to make a choice: tailor the immunity to the realities of their commercial enterprises, or "grant ... virtually unlimited tribal immunity." Id., at 764, 118 S.Ct. 1700 (Stevens, J., dissenting). The Court *821 took the latter course. In doing so, it did not "defe[r] to Congress or exercis[e] 'caution,'-rather, it ... creat[ed] law." Id., at 765, 118 S.Ct. 1700 (citation omitted). To be sure, Congress had the power to "alter" that decision if it wanted. Id., at 759, 118 S.Ct. 1700 (majority opinion). But Congress has the authority to do that with respect to any nonconstitutional decision involving federal law, and the mere existence of this authority could not be the basis for choosing one outcome over another in Kiowa .[3]
Accident or no, it was this Court, not Congress, that adopted the doctrine of tribal sovereign immunity in the first instance. And it was this Court that left open a question about its scope. Why should Congress-and only Congress, according to the Kiowa Court-have to take *2050 on a problem this Court created? In other areas of federal common law, until Congress intervenes, it is up to us to correct our errors. See, e.g., Exxon Shipping Co. v. Baker, 554 U.S. 471, 507, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) ("[I]f, in the absence of legislation, judicially derived standards leave the door open to outlier punitive-damages awards [in maritime law], it is hard to see how the judiciary can wash its hands of a problem it created, simply by calling quantified standards legislative"); National Metropolitan Bank v. United States, 323 U.S. 454, 456, 65 S.Ct. 354, 89 L.Ed. 383 (1945) ("[I]n the absence of an applicable Act of Congress, federal courts must fashion the governing rules" in commercial-paper cases affecting *822 the rights and liabilities of the United States). We have the same duty here.
II
Today, the Court reaffirms Kiowa . Unsurprisingly, it offers no new substantive defense for Kiowa 's indefensible view of tribal immunity. Instead, the majority relies on a combination of the Kiowa Court's purported deference to Congress and considerations of stare decisis . I have already explained why it was error to ground the Kiowa rule in deference to Congress. I turn now to stare decisis . Contrary to the majority's claim, that policy does not require us to preserve this Court's mistake in Kiowa . The Court's failure to justify Kiowa 's rule and the decision's untoward consequences outweigh the majority's arguments for perpetuating the error.
A
Stare decisis may sometimes be "the preferred course," but as this Court acknowledges, it is "not an inexorable command." Payne v. Tennessee, 501 U.S. 808, 827, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). "[W]hen governing decisions are unworkable or are badly reasoned," id., at 827, 111 S.Ct. 2597, or "experience has pointed up the precedent's shortcomings," Pearson v. Callahan, 555 U.S. 223, 233, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), " 'this Court has never felt constrained to follow precedent,' " Payne, supra, at 827, 111 S.Ct. 2597. See also Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 282-283, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) (overruling precedent as "deficient in utility and sense," "unsound in theory, unworkable and arbitrary in practice, and unnecessary to achieve any legitimate goals"). The discussion above explains why Kiowa was unpersuasive on its own terms. Now, the adverse consequences of that decision make it even more untenable.
In the 16 years since Kiowa, the commercial activities of tribes have increased dramatically. This is especially evident within the tribal gambling industry. Combined tribal gaming revenues in 28 States have more than tripled-from *823 $8.5 billion in 1998 to $27.9 billion in 2012. National Indian Gaming Commission, 2012 Indian Gaming Revenues Increase 2.7 Percent (July 23, 2013), online at http://www.nigc.gov/LinkClick.aspx?fileticket=Fhd5shyZ1fM% 3D (all Internet materials as visited May 2, 2014, and available in Clerk of Court's case file). But tribal businesses extend well beyond gambling and far past reservation borders. In addition to ventures that take advantage of on-reservation resources (like tourism, recreation, mining, forestry, and agriculture), tribes engage in "domestic and international business ventures" including manufacturing, retail, banking, construction, energy, telecommunications, and more. Graham, An Interdisciplinary Approach to American Indian Economic Development, 80 N. D. L. Rev. 597, 600-604 (2004). Tribal enterprises run the gamut: they sell cigarettes and prescription *2051 drugs online; engage in foreign financing; and operate greeting cards companies, national banks, cement plants, ski resorts, and hotels. Ibid. ; see also, e.g., The Harvard Project on American Indian Economic Development, The State of the Native Nations 124 (2008) (Ho-Chunk, Inc., a tribal corporation of the Winnebago Tribe of Nebraska, operates "hotels in Nebraska and Iowa," "numerous retail grocery and convenience stores," a "tobacco and gasoline distribution company," and "a temporary labor service provider"); Four Fires, San Manuel Band of Mission Indians, http://www. sanmanuel-nsn.gov/fourfires.php.html) (four Tribes from California and Wisconsin jointly own and operate a $43 million hotel in Washington, D.C.). These manifold commercial enterprises look the same as any other-except immunity renders the tribes largely litigation-proof.
As the commercial activity of tribes has proliferated, the conflict and inequities brought on by blanket tribal immunity have also increased. Tribal immunity significantly limits, and often extinguishes, the States' ability to protect their citizens and enforce the law against tribal businesses. This case is but one example: No one can seriously dispute that *824 Bay Mills' operation of a casino outside its reservation (and thus within Michigan territory) would violate both state law and the Tribe's compact with Michigan. Yet, immunity poses a substantial impediment to Michigan's efforts to halt the casino's operation permanently. The problem repeats itself every time a tribe fails to pay state taxes, harms a tort victim, breaches a contract, or otherwise violates state laws, and tribal immunity bars the only feasible legal remedy. Given the wide reach of tribal immunity, such scenarios are commonplace.[4] See, e.g., Oneida Indian Nation of New York v. Madison Cty., 605 F.3d 149, 163 (C.A.2 2010) (Cabranes, J., joined by Hall, J., concurring) ("The holding in this case comes down to this: an Indian tribe can purchase land (including land that was never part of a reservation); refuse to pay lawfully-owed taxes; and suffer no consequences because the taxing authority cannot sue to collect the taxes owed"); see also Furry v. Miccosukee Tribe of Indians of Fla., 685 F.3d 1224 (C.A.11 2012) (Tribe immune from a suit arising out of a fatal off-reservation car crash that alleged negligence and violation of state dram shop laws); Native American Distributing v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288 (C.A.10 2008) (tribal officials and a tobacco-products manufacturer were immune from a suit brought by a national *825 distributor alleging breach of contract and interstate market manipulation); Tonasket v. Sargent, 830 F.Supp.2d 1078 (E.D.Wash.2011) (tribal immunity foreclosed an action against the Tribe for illegal price fixing, antitrust violations, and unfair competition), aff'd, 510 Fed.Appx. 648 (C.A.9 2013) ; Multimedia Games, Inc. v. WLGC Acquisition Corp., 214 F.Supp.2d 1131 (N.D.Okla.2001) (tribal immunity barred a *2052 suit alleging copyright infringement, unfair competition, breach of contract, and other claims against a tribal business development agency).
In the wake of Kiowa, tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality. Martin & Schwartz, The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk? 69 Wash. & Lee L. Rev. 751, 758-759, 777 (2012). Indian tribes have also created conflict in certain States by asserting tribal immunity as a defense against violations of state campaign finance laws. See generally Moylan, Sovereign Rules of the Game: Requiring Campaign Finance Disclosure in the Face of Tribal Sovereign Immunity, 20 B.U. Pub. Interest L.J. 1 (2010).
In sum, any number of Indian tribes across the country have emerged as substantial and successful competitors in interstate and international commerce, both within and beyond Indian lands. As long as tribal immunity remains out of sync with this reality, it will continue to invite problems, including de facto deregulation of highly regulated activities; unfairness to tort victims; and increasingly fractious relations with States and individuals alike. The growing harms wrought by Kiowa 's unjustifiable rule fully justify overruling it.
*826 B
In support of its adherence to stare decisis, the majority asserts that "Congress has now reflected on Kiowa " and has decided to "retain" the decision. Ante, at 2037; see also ante, at 2039 ("[W]e act today against the backdrop of an apparent congressional choice: to keep tribal immunity ... in a case like this one"). On its face, however, this is a curious assertion. To this day, Congress has never granted tribal sovereign immunity in any shape or form-much less immunity that extends as far as Kiowa went. What the majority really means, I gather, is that the Court must stay its hand because Congress has implicitly approved of Kiowa 's rule by not overturning it.
This argument from legislative inaction is unavailing. As a practical matter, it is " 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of" one of this Court's decisions. Patterson v. McLean Credit Union, 491 U.S. 164, 175, n. 1, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (quoting Johnson v. Transportation Agency, Santa Clara Cty., 480 U.S. 616, 672, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (SCALIA, J., dissenting)); see also Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) ("It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law"); Helvering v. Hallock, 309 U.S. 106, 121, 60 S.Ct. 444, 84 L.Ed. 604 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle"). There are many reasons Congress might not act on a decision like Kiowa, and most of them have nothing at all to do with Congress' desire to preserve the decision. See Johnson, 480 U.S., at 672, 107 S.Ct. 1442 (SCALIA, J., dissenting) (listing various kinds of legislative inertia, including an "inability to agree upon how to alter the status quo" and "indifference to the status quo").
Even assuming the general validity of arguments from legislative inaction, they *2053 are a poor fit in this common-law context. Such arguments are typically based on the premise *827 that the failure of later Congresses to reject a judicial decision interpreting a statute says something about what Congress understands the statute to mean. See, e.g., id., at 629, n. 7, 107 S.Ct. 1442 (majority opinion). But it is not clear why Congress' unenacted "opinion" has any relevance to determining the correctness of a decision about a doctrine created and shaped by this Court. Giving dispositive weight to congressional silence regarding a common-law decision of this Court effectively codifies that decision based only on Congress' failure to address it. This approach is at odds with our Constitution's requirements for enacting law. Cf. Patterson,supra, at 175, n. 1, 109 S.Ct. 2363 ("Congress may legislate ... only through the passage of a bill which is approved by both Houses and signed by the President. Congressional inaction cannot amend a duly enacted statute" (citation omitted)). It is also the direct opposite of this Court's usual approach in common-law cases, where we have made clear that, "in the absence of an applicable Act of Congress, federal courts must fashion the governing rules." National Metropolitan Bank, 323 U.S., at 456, 65 S.Ct. 354; see also supra, at 2051 - 2052; Moragne v. States Marine Lines, Inc., 398 U.S. 375, 378, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (precedent barring recovery for wrongful death, "somewhat dubious even when rendered, is such an unjustifiable anomaly in the present maritime [common] law that it should no longer be followed").[5] Allowing *828 legislative inaction to guide common-law decisionmaking is not deference, but abdication.[6] *2054 In any event, because legislative inaction is usually indeterminate, we " 'require very persuasive circumstances enveloping Congressional silence to debar this Court from reexamining its own doctrines.' " Girouard, supra, at 69, 66 S.Ct. 826. Here, the majority provides nothing that solidifies the inference of approval it draws from congressional silence in the wake of Kiowa .
First, the majority cites two Senate bills that proposed to abrogate tribal immunity for contract and tort claims against tribes. See S. 2299, 105th Cong., 2d Sess. (1998) (contract claims); S. 2302, 105th Cong., 2d Sess. (1998) (tort claims). Neither bill expresses Congress' views on Kiowa 's rule, for both died in committee without a vote.
*829 Second, the majority notes various post-Kiowa enactments that either abrogate tribal immunity in various limited contexts or leave it be. See ante, at 2037, 2038, n. 10. None of these enactments provides a reason to believe that Congress both considered and approved Kiowa 's holding. None of them targets with any precision the immunity of Indian tribes for off-reservation commercial activities. See, e.g., Indian Tribal Economic Development and Contract Encouragement Act of 2000 (codified at 25 U.S.C. § 81(d)(2) ) (for contracts that encumber Indian lands for more than seven years, tribes must either provide for breach-of-contract remedies or disclose tribal immunity if applicable). And given the exceedingly narrow contexts in which these provisions apply, see, e.g., Arizona Water Settlements Act, § 213(a)(2), 118 Stat. 3531 (abrogating one tribe's immunity for the limited purpose of enforcing water settlements), the far stronger inference is that Congress simply did not address Kiowa or its extension of immunity in these Acts; rather, Congress considered only whether an abrogation of judge-made tribal immunity was necessary to the narrow regulatory scheme on the table. See, e.g., Prevent All Cigarette Trafficking Act of 2009, §§ 2(e), 3(a), 124 Stat. 1101, 1108.
The majority posits that its inference of congressional approval of Kiowa is stronger because Congress failed to act after the Kiowa Court "urg[ed]" Congress to consider the question presented. Ante, at 2037, 2038 - 2039 (quoting Kiowa, 523 U.S., at 758, 118 S.Ct. 1700) ("[W]e defer to the role Congress may wish to exercise in this important judgment"). But this circumstance too raises any number of inferences. Congress is under no obligation to review and respond to every statement this Court makes; perhaps legislative inertia simply won out. The majority seems to suggest that Congress understood Kiowa to assign the burgeoning problems of expansive common-law immunity to the Legislature, and then chose to let those problems fester. But Congress has not explained its inaction, and we should not pretend that it has *830 done so by remaining silent after we supposedly prodded it to say something. Even if we credit the relevance of post-Kiowa congressional silence in this common-law context-and I do not-there is certainly not enough evidence of congressional acquiescence here "that we can properly place on the shoulders of Congress the burden of the Court's own error." Girouard, 328 U.S., at 69-70, 66 S.Ct. 826.
C
The majority's remaining arguments for retaining Kiowa are also unconvincing.
First, the majority characterizes Kiowa as one case in a "long line of precedents" in which the Court has recognized tribal immunity "without any exceptions for commercial or off-reservation conduct." Ante, at 2036. True, the Court has relied on tribal immunity as a general matter in *2055 several cases. But not until Kiowa were we required to decide whether immunity should extend to commercial activities beyond Indian reservations. See supra, at 2048. And after Kiowa, we have mentioned it only once, and then only in dicta. C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla., 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) (holding that the Tribe had waived its immunity in a construction contract). Thus, overturning Kiowa would overturn Kiowa only.
Second, the majority suggests that tribes and their business partners have now relied on Kiowa in structuring their contracts and transactions. Ante, at 2036. But even when Kiowa extended the scope of tribal immunity, it was readily apparent that the Court had strong misgivings about it. Not one Member of the Kiowa Court identified a substantive justification for its extension of immunity: Three would not have expanded the immunity in the first place, Kiowa, 523 U.S., at 760, 118 S.Ct. 1700 (Stevens, J., dissenting), and the other six essentially expressed hope that Congress would overrule the Court's decision, see id., at 758-759, 118 S.Ct. 1700. Against that backdrop, it would hardly be reasonable for a tribe to rely on Kiowa as *831 a permanent grant of immunity for off-reservation commercial activities. In any event, the utter absence of a reasoned justification for Kiowa 's rule and its growing adverse effects easily outweigh this generalized assertion of reliance. See, e.g., Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 906, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (in the antitrust context, overturning the per se rule against vertical price restraints in part because the "reliance interests" in the case could not " justify an inefficient rule").
* * *
In Kiowa, this Court adopted a rule without a reason: a sweeping immunity from suit untethered from commercial realities and the usual justifications for immunity, premised on the misguided notion that only Congress can place sensible limits on a doctrine we created. The decision was mistaken then, and the Court's decision to reaffirm it in the face of the unfairness and conflict it has engendered is doubly so. I respectfully dissent.

State sovereign immunity is an exception: This Court has said that the States' immunity from suit in federal court is secured by the Constitution. See Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("[F]or over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States"); Alden v. Maine, 527 U.S. 706, 733, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("Although the sovereign immunity of the States derives at least in part from the common-law tradition, ... the immunity exists today by constitutional design"). Unlike the States, Indian tribes "are not part of this constitutional order," and their immunity is not guaranteed by it. United States v. Lara, 541 U.S. 193, 219, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (THOMAS, J., concurring in judgment).

The Court in Kiowa noted that in one case, we upheld a claim of immunity where "a state court had asserted jurisdiction over tribal fishing 'both on and off its reservation.' " 523 U.S., at 754, 118 S.Ct. 1700 (quoting Puyallup Tribe, Inc. v. Department of Game of Wash., 433 U.S. 165, 167, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) ). It went on to admit, however, that Puyallup "did not discuss the relevance of where the fishing had taken place." 523 U.S., at 754, 118 S.Ct. 1700. And, as Justice Stevens explained in dissent, that case was about whether the state courts had jurisdiction to regulate fishing activities on the reservation; "we had no occasion to consider the validity of an injunction relating solely to off-reservation fishing." Id ., at 763, 118 S.Ct. 1700.

Nor did the Kiowa Court "defer" to any pre-existing congressional policy choices. As I have already made clear, the rule the Court chose in Kiowa was divorced from, and in some ways contrary to any federal interest. See Part I-A, supra ; see also Kiowa, 523 U.S., at 765, 118 S.Ct. 1700 (Stevens, J., dissenting). And the rule is a "strikingly anomalous" departure from the immunities of other sovereigns in federal and state court. Ibid. (observing that Kiowa conferred on Indian tribes "broader immunity than the States, the Federal Government, and foreign nations"); see also Florey, Indian Country's Borders: Territoriality, Immunity, and the Construction of Tribal Sovereignty, 51 Boston College L.Rev. 595, 627 (2010) (After Kiowa , "the actual contours of [tribal immunity] remain astonishingly broad").

Lower courts have held that tribal immunity shields not only Indian tribes themselves, but also entities deemed "arms of the tribe." See, e.g., Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1191-1195 (C.A.10 2010) (casino and economic development authority were arms of the Tribe); Memphis Biofuels, LLC v. Chickasaw Nation Industries, Inc., 585 F.3d 917, 921 (C.A.6 2009) (tribal conglomerate was an arm of the Tribe). In addition, tribal immunity has been interpreted to cover tribal employees and officials acting within the scope of their employment. See, e.g., Cook v. AVI Casino Enterprises, Inc., 548 F.3d 718, 726-727 (C.A.9 2008) ; Native American Distributing v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288, 1296 (C.A.10 2008) ; Chayoon v. Chao, 355 F.3d 141, 143 (C.A.2 2004) (per curiam ); Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla., 177 F.3d 1212, 1225-1226 (C.A.11 1999).

The majority appears to agree that the Court can revise the judicial doctrine of tribal immunity, because it reserves the right to make an "off-reservation" tort exception to Kiowa 's blanket rule. See ante, at 2036 - 2037, n. 8. In light of that reservation, the majority's declaration that it is "Congress's job ... to determine whether or how to limit tribal immunity" rings hollow. Id., at 2037. Such a judge-made exception would no more defer to Congress to "make the call whether to curtail a tribe's immunity" than would recognizing that Kiowa was wrongly decided in the first instance. Id., at 2037. In any event, I welcome the majority's interest in fulfilling its independent responsibility to correct Kiowa 's mistaken extension of immunity "without any exceptions for commercial or off-reservation conduct." Id., at 2036. I regret only that the Court does not see fit to take that step today.

Of course, stare decisis still applies in the common-law context; I reject only the notion that arguments from legislative inaction have any place in the analysis.
I also reject the majority's intimation that stare decisis applies as strongly to common-law decisions as to those involving statutory interpretation. The majority asserts that stare decisis should have " 'special force' " in this case because " 'Congress remains free to alter what we have done.' " Ante, at 2036 (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 172-173, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) ). Although the Court has invoked this reasoning in the statutory context, I am not aware of a case in which we have relied upon it to preserve a common-law decision of this Court. Indeed, we have minimized that reasoning when interpreting the Sherman Act precisely because "the Court has treated the Sherman Act as a common-law statute." Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 899, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (emphasis added); see also State Oil Co. v. Khan, 522 U.S. 3, 20-21, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("[T]he general presumption that legislative changes should be left to Congress has less force with respect to the Sherman Act in light of the accepted view that Congress 'expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition' "). Surely no higher standard of stare decisis can apply when dealing with common law proper, which Congress certainly expects the Court to shape in the absence of legislative action. See, e.g., National Metropolitan Bank v. United States, 323 U.S. 454, 456, 65 S.Ct. 354, 89 L.Ed. 383 (1945).